AF Approval ____JXH_____          Chief Approval _____MPF_____

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

UNITED STATES OF AMERICA

205-RBD-DCI

     v.                         CASE NO. 6:22-cr-~~90-CEM-LHP~~

BRIAN ALEXIS PAGAN DIAZ

## PLEA AGREEMENT

      Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Roger B. Handberg, United States Attorney for the Middle District of Florida, and the defendant, Brian Alexis Pagan Diaz, and the attorney for the defendant, Grady C. Irvin, Jr., Esq., mutually agree as follows:

**A.**    **Particularized Terms**

    1.    <u>Count Pleading To</u>

      The defendant shall enter a plea of guilty to Count One of the Indictment. Count One charges the defendant with unlawfully engaging in the business of dealing in firearms and aiding and abetting the same in violation 18 U.S.C. §§ 922(a)(1)(A), 923(a) and 924(a)(1)(D), and aiding and abetting the same in violation of 18 U.S.C. § 2.

Defendant's Initials _____

2.    Maximum Penalties

Count One carries a maximum sentence of five years imprisonment, a fine of up to $250,000, a term of supervised release of at least three years, and a special assessment of $100.

With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offense, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense, or to the community, as set forth below.

3.    Elements of the Offense

The defendant acknowledges understanding the nature and elements of the offense with which defendant has been charged and to which defendant is pleading guilty.

The elements of Count One are:

First:    the Defendant engaged in the business of dealing in firearms or aided and abetted others in engaging in that business;

Second:    the Defendant did not have a Federal license; and

Third:    the Defendant acted willfully.

4.    No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the United States

Defendant's Initials RARD          2

Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

5.    <u>Acceptance of Responsibility - Three Levels</u>

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant

agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

      6.    Guidelines Sentence

      Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

      7.    Forfeiture of Assets

      The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c), whether in the possession or control of the United States, the defendant or defendant's nominees.

      The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil judicial or administrative forfeiture action. The defendant also agrees to waive all constitutional, statutory and procedural

Defendant's Initials _BARD_        4

challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture and to transfer custody of such property to the United States before the defendant's sentencing. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8

Defendant's Initials _Bart_           5

will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing. In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control directly or indirectly, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct.

The defendant agrees that the United States is not limited to forfeiture of the property specifically identified for forfeiture in this Plea Agreement. If the United States determines that property of the defendant identified for forfeiture cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court;

Defendant's Initials _BARD_                    6

has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; then the United States shall, at its option, be entitled to forfeiture of any other property (substitute assets) of the defendant up to the value of any property described above.  The Defendant expressly consents to the forfeiture of any substitute assets sought by the Government.  The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement.  The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be

Defendant's Initials  BADD                    7

binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including satisfaction of any preliminary order of forfeiture for proceeds.

**B.    Standard Terms and Conditions**

1.    Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. To ensure that this obligation is satisfied, the Defendant agrees to deliver a cashier's check, certified

Defendant's Initials _BARD_                8

check, or money order to the Clerk of the Court in the amount of $100, payable to "Clerk, U.S. District Court" within ten days of the change of plea hearing. The defendant understands that this agreement imposes no limitation as to fine.

    2.    <u>Supervised Release</u>

    The defendant understands that the offense to which the defendant is pleading provides for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

    3.    <u>Immigration Consequences of Pleading Guilty</u>

    The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

    4.    <u>Sentencing Information</u>

    The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate

Defendant's Initials _BAPD_         9

regarding the disposition of this case, subject to any limitations set forth herein, if
any.

     5.    Financial Disclosures

        Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii),
the defendant agrees to complete and submit to the United States Attorney's Office
within 30 days of execution of this agreement an affidavit reflecting the defendant's
financial condition. The defendant promises that his financial statement and
disclosures will be complete, accurate and truthful and will include all assets in
which he has any interest or over which the defendant exercises control, directly or
indirectly, including those held by a spouse, dependent, nominee or other third party.
The defendant further agrees to execute any documents requested by the United
States needed to obtain from any third parties any records of assets owned by the
defendant, directly or through a nominee, and, by the execution of this Plea
Agreement, consents to the release of the defendant's tax returns for the previous five
years. The defendant similarly agrees and authorizes the United States Attorney's
Office to provide to, and obtain from, the United States Probation Office, the
financial affidavit, any of the defendant's federal, state, and local tax returns, bank
records and any other financial information concerning the defendant, for the
purpose of making any recommendations to the Court and for collecting any
assessments, fines, restitution, or forfeiture ordered by the Court. The defendant

Defendant's Initials 𝒷𝒜𝒫𝒟        10

expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

    6.    <u>Sentencing Recommendations</u>

        It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7.     Defendant's Waiver of Right to Appeal the Sentence

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.     Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

Defendant's Initials _____          12

9.    Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.    Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty,

Defendant's Initials PRD                13

defendant waives or gives up those rights and there will be no trial. The defendant

further understands that if defendant pleads guilty, the Court may ask defendant

questions about the offense or offenses to which defendant pleaded, and if defendant

answers those questions under oath, on the record, and in the presence of counsel (if

any), defendant's answers may later be used against defendant in a prosecution for

perjury or false statement. The defendant also understands that defendant will be

adjudicated guilty of the offenses to which defendant has pleaded and, if any of such

offenses are felonies, may thereby be deprived of certain rights, such as the right to

vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.    Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The

defendant certifies that defendant does hereby admit that the facts set forth in the

attached "Factual Basis," which is incorporated herein by reference, are true, and

were this case to go to trial, the United States would be able to prove those specific

facts and others beyond a reasonable doubt.

12.    Entire Agreement

This plea agreement constitutes the entire agreement between the

government and the defendant with respect to the aforementioned guilty plea and no

other promises, agreements, or representations exist or have been made to the

defendant or defendant's attorney with regard to such guilty plea.

Defendant's Initials $\mathcal{PAP}$                14

13.    Certification

The defendant and defendant's counsel certify that this plea agreement

has been read in its entirety by (or has been read to) the defendant and that defendant

fully understands its terms.

DATED this ___11th___ day of ___April___, 2023.

Respectfully Submitted,

ROGER B. HANDBERG
United States Attorney

_____          _____
BRIAN ALEXIS PAGAN DIAZ            Dana E. Hill
Defendant                          Assistant United States Attorney

_____          _____
Grady C. Irvin, Jr., Esq.          Michael P. Felicetta
Attorney for Defendant             Assistant United States Attorney
                                   Chief, Orlando Division

Defendant's Initials _BAPD_                    15

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.

CASE NO. 6:22-cr-~~90-CEM-LHP~~ 205-RBD-DCI

BRIAN ALEXIS PAGAN DIAZ

## PERSONALIZATION OF ELEMENTS

For Count One, at the times set forth in the indictment:

First: Did you engaged in the business of dealing in firearms or aid and
abet others in the engagement of that business?

Second: Did you not have a federal license?

Third: Did you act willfully?

Defendant's Initials BAPD                 16

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.

BRIAN ALEXIS PAGAN DIAZ

205 - RBD - DCI

CASE NO. 6:22-cr-90-CEM-LHP

## FACTUAL BASIS

In 2021, the DEA initiated an investigation into drug trafficking and money

laundering activities in the Orlando area and the FBI initiated an investigation into

unlawful dealing in firearms in the same area.  In the course of that investigation, the

DEA and the FBI discovered that Brian Alexis PAGAN-DIAZ, Bengie Emannual

SILVA RAMOS, and numerous other individuals were involved in unlawful

dealings in firearms. Law enforcement obtained court-ordered authorization to

monitor multiple telephones used by members of the conspiracy and conducted

surveillance of their activities. That investigation yielded evidence demonstrating the

following true facts about that network and Defendant SILVA RAMOS's

involvement:

Pursuant to court-ordered authorization, the FBI and DEA intercepted

communications on (xxx) xxx-5893 (Target Telephone-6) starting on May 4, 2022.

SILVA-RAMOS regularly communicated on Target Telephone-6 with PAGAN-

Defendant's Initials _BAPD_                17

DIAZ on (xxx) xxx-1235 and others about the business of obtaining firearms and reselling them for profit.

### *Conversations on May 4, 2022*

On May 4, 2022, at approximately 11:25 a.m., PAGAN-DIAZ called SILVA-RAMOS and asked "about the short ones," referring to firearms, and SILVA-RAMOS replied "That dude haven't wake." At approximately 1:00 p.m., SILVA-RAMOS called PAGAN-DIAZ and informed him that "he says he is gonna get there at the complex in a bit." PAGAN-DIAZ complained "I'm not making money and I gotta pay a lot of stuff." SILVA-RAMOS said: "me too brother. I'm trying to claim all the money I have on the street." PAGAN-DIAZ said "from tomorrow on, tomorrow I'll buy 10 grams of fentanyl and I'll start selling." The two continued to complain about their business and PAGAN-DIAZ told SILVA-RAMOS "I collect 500 bucks yesterday from the dog's s*** and then the 300 bucks that the guy gave me, I bought the gun and he hasn't even pick it up because he's f****** mad at me." SILVA-RAMOS replied "But dude, that wasn't my fault brother, I even pass it on the same price they gave it to me."

In this conversation, SILVA-RAMOS referred to providing a firearm to PAGAN-DIAZ for resale, claiming that he had provided the gun to PAGAN-DIAZ at the same price at which SILVA-RAMOS obtained it.

Defendant's Initials ꓭꓤꓦꓵ    18

At approximately 10:00 p.m., PAGAN-DIAZ told SILVA-RAMOS "I'm waiting for the boy." SILVA-RAMOS said "he's coming down for sure so I can send for the guy that told me he will buy it now," referring to SILVA-RAMOS getting the firearm from his source. PAGAN-DIAZ told SILVA-RAMOS "wait for him to get there . . . I will call you when he gets here and I have it in my hands," referring to the payment for the firearm.

At approximately 10:43 p.m., SILVA-RAMOS told PAGAN-DIAZ "I'll check with the guy now, for the short ones, so I can pick them," referring to handguns he was obtaining to give to PAGAN-DIAZ for resale to a third party. SILVA-RAMOS continued "I have the 19 of the fifth already," referring to a Glock 19, fifth generation handgun. PAGAN-DIAZ said "if you bring them to me and you let me . . . I'll arrive fast where the guy is, they're going to buy all of them."

In these conversations, SILVA-RAMOS and PAGAN-DIAZ were discussing their ongoing business arrangement, in which SILVA-RAMOS would obtain firearms and provide them to PAGAN-DIAZ for him to resell.

**_Conversations on May 5, 2022:_**

On May 5, 2022, at approximately 1:11 p.m., PAGAN-DIAZ called SILVA-RAMOS and asked "you have them or not?" SILVA-RAMOS replied "Yes and I have others too. So I'm going to call you in two minutes . . . I'll go to your house now." PAGAN-DIAZ said "alright, they are waiting they are calling me brother."

Defendant's Initials _PAPP_       19

SILVA-RAMOS replied "We have everything but the 19s. There were like six I have four," referring to Glock 19 handguns and other firearms.

At approximately 1:52 p.m., SILVA-RAMOS told PAGAN-DIAZ "I'm coming to Orlando now" and "I'll see you there fast. I'm heading over there to look for the tickets those as well because I am going to sell them" using the term "tickets" to refer to payment for illicit items. PAGAN-DIAZ replied "alright."

At approximately 2:30 p.m., PAGAN-DIAZ called SILVA-RAMOS to tell him "that woman does not need you for anything she said." PAGAN-DIAZ said "I'm going to see you when I see you and will give you the ticket and now, I don't want the short ones. I'm not going to see anything. Keep everything that is the truth." SILVA-RAMOS replied "Why brother, do you know how much money . . . I had to paid it out of my pocket brother, it's almost $3,000 and something dollars I expended there." PAGAN-DIAZ relayed that "Dude yes, since yesterday . . . I have been feeling so bad," referring to canceling an order he placed with SILVA-RAMOS, causing SILVA-RAMOS to have spent money for guns where the ultimate buyer fell through.

At approximately 5:35 p.m., SILVA-RAMOS informed PAGAN-DIAZ "I'm heading down dude, I'm almost there . . .. It's that there's traffic but I have everything on top. Look one of the nineteens, the nineteen that they just gave me they left it at eight and a half, fifth but fucker it's customized." PAGAN-DIAZ

Defendant's Initials BAPIL                    20

responded "Alright, it's okay." SILVA-RAMOS continued "I am going to show you

the red and black." PAGAN-DIAZ said "Alright so that I stay with him.  I want

one."

At approximately 6:01 p.m., SILVA-RAMOS called PAGAN-DIAZ again,

stating "There is a 45 there" referring to a 45 caliber handgun.  SILVA-RAMOS

stated "that 45 is a 19x but it's completely black . . .  it says 45 it's the difference but

its' the same as the 45, the, the 19x. . . . Okay and later two 19 and the 17."  In this

conversation, SILVA-RAMOS was describing the firearms he was obtaining and

providing to PAGAN-DIAZ for resale.

At approximately 6:58 p.m., PAGAN-DIAZ asked SILVA RAMOS "Is the

red one you gave me there, where is it? . . .  Its that I haven't opened the box I'm

taking my family to the airport."  SILVA-RAMOS then gave PAGAN-DIAZ an

inventory of the items he delivered to PAGAN DIAZ: "There's a black 19x that's 45

that he gave me for 900. He gave me the red customized one that's red and black for

eight and a half, the other 17 for 825 and then 7.5 for the other 19, the one that

Coochi's homeboy had.  We will eat with that one, so I can get some for myself.

That one was 7.5." This call refers to SILVA-RAMOS delivering a box of firearms to

PAGAN-DIAZ including (1) a Glock 19x that was a 45 caliber that SILVA-RAMOS

obtained for $900, (2) a red and black customized Glock 19 fifth generation that

SILVA-RAMOS obtained for $850, (3) a Glock 17 that SILVA-RAMOS obtained

Defendant's Initials _BAPIS_                    21

for $825, and (4) a Glock 19 that SILVA-RAMOS obtained for $750. SILVA-
RAMOS was relaying these prices so that PAGAN-DIAZ could sell these firearms
for a shared profit with SILVA-RAMOS.

***Conversations on May 6, 2022***

On May 6, 2022, at approximately 5:49 p.m., PAGAN-DIAZ called SILVA-
RAMOS to let him know "a fucking patrol arrived where I was doing the deal I got
nervous dude and they gave me 100 bucks less fucker and there the cops are there."
SILVA-RAMOS asked "what are the cops doing there?" PAGAN-DIAZ replied:
"his brother died with fentanyl." SILVA-RAMOS asked "Right now?" PAGAN-
DIAZ affirmed. SILVA-RAMOS asked "they gave you 100 bucks less?" PAGAN-
DIAZ said "yes dude, to head back here to get $100 its hard." SILVA-RAMOS
replied "no dude come back everything is fine." PAGAN-DIAZ stated "so gave me
$900 for the 45 and for the 19 that 9 for the 19 I asked . . . for the 19 . . . let me check
the backpack. I don't even know what the f**** I've sold."

At approximately 6:11 p.m., the two had another conversation in which they
talk about PAGAN-DIAZ avoiding "patrols." At approximately 6:15 p.m.,
PAGAN-DIAZ relayed that "I've lost them already they're all over the highway
searching for me." At approximately 6:20 p.m., SILVA-RAMOS said he talked to
"my attorney and he says that the county, they don't get all the way up there."

Defendant's Initials BADA                 22

In these conversations, PAGAN-DIAZ was reporting the prices PAGAN-DIAZ was obtaining in their shared business of reselling firearms profit, including a failed sale in which an overdose occurred.

At approximately 6:49 p.m., PAGAN-DIAZ reported to SILVA-RAMOS "I'm already in a place here, waiting for my homeboy . . . he's going to buy the G2C," referring to an off-brand pistol, and "he's gonna gonna give me some money now and the rest later so I'm gonna sell it to him to keep the red one as well," referring to the customized red Glock 19 that SILVA-RAMOS had obtained for PAGAN-DIAZ. PAGAN-DIAZ then recounted the deal earlier in the evening in which the overdose occurred. PAGAN-DIAZ told SILVA-RAMOS "I'm not gonna get arrested for a fentanyl death, that f***** doesn't even know my name." SILVA-RAMOS replied "Exactly."

In all of the conversation of May 4 through May 6, 2022, it is clear that both SILVA-RAMOS and PAGAN-DIAZ were involved in the business of distributing firearms for profit.

### *Conversations on May 12, 2022*

On May 12, 2022, at approximately 2:59 p.m., PAGAN-DIAZ called SILVA-RAMOS. PAGAN-DIAZ said "the sticks . . . why don't we get with those 'sticks' in Springfield?" SILVA-RAMOS asked "send it directly there? . . . get prepared and send it or drive it up there?" PAGAN-DIAZ replied "No not drive it because I don't

Defendant's Initials ⟨BAP⟩          23

have a license and there's a lot of states." PAGAN-DIAZ said "the cousin tells me

that we can even sell them at two bucks," referring to $2,000. SILVA-RAMOS

replied "because what we can do is send four, five so it's worth it. You feel me?"

PAGAN-DIAZ said, "If they're at two we're getting the the the triple of what we're

getting them." SILVA-RAMOS replied, "That's what I'm telling you brother,

because I'm getting them at 800 bucks." PAGAN-DIAZ said "and if we sell them at

2 bucks," SILVA-RAMOS replied "half and half . . . let me know."

In this conversation, SILVA-RAMOS and PAGAN-DIAZ were referring to

their mutual business of distributing firearms for shared profit in which PAGAN-

DIAZ would line up customers and SILVA-RAMOS would obtain firearms and the

two would share in the profits of the sales.  In this instances, SILVA-RAMOS and

PAGAN-DIAZ were discussing how to deliver firearms to a recipient in another

state.

### *May 13, 2022 Conversations*

On May 13, 2022, at approximately 6:44 p.m., SILVA-RAMOS called

PAGAN-DIAZ "I was at the armory getting out the 19. I have the 19 and a 19x,"

referring to firearms. SILVA-RAMOS told PAGAN-DIAZ "I'm on the way . . .

around five minutes." At approximately 7:18 p.m., PAGAN-DIAZ called SILVA-

RAMOS "Look the silencers, do you have them?" SILVA-RAMOS replied "I don't

Defendant's Initials _RAPD_          24

have them in hand. I'm waiting for the dude who is in rehab. He says he will be out
in the next couple of days to give me that."

At approximately 8:54 p.m., PAGAN-DIAZ called SILVA-RAMOS and told
him "Dude, they want to buy the other one but they don't want to pay the same
because the other one is new in the box and that one is used and is all scratched."
SILVA-RAMOS asked "what other one?" PAGAN-DIAZ replied "The one you just
gave me." SILVA-RAMOS said "That one was scratched? Damn. Which what set it
up for eight, nine and a half." PAGAN-DIAZ said "It is that they don't want to pay
much. That is what they have been telling me . . . . they told me that are not going to
pay like the other one when they gave me 1000 pesos." The two then discussed
whether to sell it for less or return it.

In these calls, SILVA-RAMOS and PAGAN-DIAZ discuss a current sale of at
least two guns, one of which was damaged.

### *June 2, 2022 Arrest*

On June 2, 2022, PAGAN-DIAZ was arrested in connection with an
investigation by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF).
While conducting the arrest, ATF agents observed a red and black customized Glock
pistol in the car where PAGAN-DIAZ was arrested.

Defendant's Initials _PAD_                25

In all of these conversations, PAGAN-DIAZ, from May 4, 2022 through his arrest on June 2, 2022, willfully engaged in, and aided and abetted others in, the business of firearms dealing without a federal license.